The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
DELORES MIELE

MAY 26 2004

**(b)** County of Residence of First       Nevada, California
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Joe Kendall
Provost ★Umphrey Law Firm, L.L.P.
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204

**DEFENDANTS**
UICI, GREGORY T. MUTZ, RONALD L. JENSEN, J. TIM CLARK, GLENN W. REED, DAVID W. KEELER, MARK D. HAUPTMAN and MATTHEW R. CASSELL

County of Residence of First Listed       Tarrant, Texas
(IN U.S. PLAINTIFF CASES ONLY)
NOTE   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED

Attorneys (If Known)

3-04CV-1149P

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

X 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 22 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 23 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | X 850 Securities/Commodities/ |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | Exchange |
| (Excl Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 875 Customer Challenge |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | 12 USC 3410 |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S Plaintiff | Determination Under Equal |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus | | or Defendant) | Access to Justice |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret Inc. | 26 USC 7609 | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

X 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Violation of Securities Exchange Act of 1934

**VII. REQUESTED IN COMPLAINT:**
X CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:   X Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions):
JUDGE                              DOCKET NUMBER

DATE
5-26-04

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT              APPLYING IFP              JUDGE              MAG JUDGE

```
                                                          ...CT COURT
                                                   ......STRICT OF TEXAS
                                                        FILED
        UNITED STATES DISTRICT COURT
                                                     MAY 2 6 2004
        NORTHERN DISTRICT OF TEXAS
                                                   ...RK, U.S. DISTRICT COURT
              DALLAS DIVISION                      by
                                                         Deputy
```

| | |
|---|---|
| DOLORES MIELE, On Behalf of Herself and All Others Similarly Situated,<br><br>            Plaintiff,<br><br>  vs.<br><br>UICI, GREGORY T. MUTZ, RONALD L. JENSEN, J. TIM CLARK, GLENN W. REED, DAVID W. KEELER, MARK D. HAUPTMAN and MATTHEW R. CASSELL,<br><br>            Defendants. | § § § § § § § § § § § § § § § | Civil Action No.<br><br>CLASS ACTION<br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

## NATURE OF ACTION

1.     This is a securities class action on behalf of persons who purchased the common stock of UICI ("UICI" or the "Company") between January 17, 2000 and July 21, 2003, inclusive (the "Class Period"), against UICI and certain of its senior officers. UICI is a diversified financial services company offering financial services, health administrative services and insurance through its various subsidiaries and divisions to niche consumer and institutional markets.

2.     During the Class Period, the defendants who controlled and were senior officers of UICI, engaged in the scheme to conceal UICI's badly flagging Academic Management Services Corp. ("AMS") division to prevent the decline in the price of UICI stock in order to: (i) protect and enhance their executive positions and substantial compensation; (ii) sell their shares in UICI at artificially inflated prices; and (iii) enhance the value of their personal UICI securities holdings and options.

3.     On July 21, 2003, UICI dropped a bomb on investors, revealing that it would record a charge of at least $65 million. This revelation caused trading in UICI stock to be halted on the New York Stock Exchange and ultimately to plummet to less than $12 per share, a decline of 45% from its Class Period high of $21.22 per share.

## JURISDICTION AND VENUE

4.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

5.     Venue is proper in this District pursuant to §27 of the Exchange Act. Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred

in this District. UICI has its principal place of business at 9151 Grapevine Highway, North Richland Hills, Texas.

6.        In connection with the acts, conduct and other wrongs complained of, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of the national securities markets.

## THE PARTIES

7.        Plaintiff Dolores Miele purchased UICI common stock during the Class Period as detailed in the attached certification and was damaged thereby.

8.        Defendant UICI is headquartered in North Richland Hills, Texas, and represents itself as a diversified financial services company offering financial services, health administrative services and insurance through its various subsidiaries and divisions to niche consumer and institutional markets. UICI provides health insurance through its insurance subsidiaries United Group Association and Cornerstone Marketing of America; Internet-enabled software for health insurance and healthcare markets through Insurdata; enrollment, billing and collection claims administration and risk management services for healthcare payors and providers through UICI Administrators; credit cards for individuals with no credit or troubled credit histories through United CreditServ; financial services and products for college, undergraduates and graduate students, including providing federally guaranteed student loans through the Educational Finance Group; and markets blocks of life insurance and life insurance products to select markets through its OKC division. UICI's stock is traded in an efficient market on the New York Stock Exchange. Defendant UICI can be served at 9151 Grapevine Highway, North Richland, Texas 76180.

9.        Defendant Gregory T. Mutz ("Mutz") was, during the Class Period, President, Chief Executive Officer and a director of UICI until July 1, 2003 and Vice Chairman of UICI after July 1, 2003. Because of Mutz's positions, he knew the adverse non-public information about the business

- 2 -

of UICI, as well as its finances, markets and present and future business prospects via access to internal corporate documents (including UICI's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and via reports and other information provided to him in connection therewith. During the Class Period, Mutz participated in the issuance of false and/or misleading statements, including the preparation and/or review of the false and/or misleading press releases and SEC filings. During the Class Period, while in possession of adverse non-public information, Mutz sold 482,211 UICI shares for proceeds of $6.4 million. Defendant Mutz can be served at 8 Rock Ridge Road, Barrington, Illinois 60010.

10. Defendant Ronald L. Jensen ("Jensen") was, during the Class Period, Chairman of the Board of UICI. Because of Jensen's position, he knew the adverse non-public information about the business of UICI, as well as its finances, markets and present and future business prospects via access to internal corporate documents (including UICI's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and via reports and other information provided to him in connection therewith. During the Class Period, Jensen participated in the issuance of false and/or misleading statements, including the preparation and/or review of the false and/or misleading press releases and SEC filings. During the Class Period, while in possession of adverse non-public information, Jensen sold 175,000 UICI shares for proceeds of $1.1 million. Defendant Jensen may be served at 4516 Windsor Ridge, Irving, Texas 75038.

11. Defendant J. Tim Clark ("Clark") was, during the Class Period, President and Chief Executive Officer of the Company's AMS division. Because of Clark's positions, he knew the adverse non-public information about the business of UICI, as well as its finances, markets and present and future business prospects via access to internal corporate documents (including UICI's

- 3 -

operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Class Period, Clark participated in the issuance of false and/or misleading statements, including the preparation and/or review of the false and/or misleading press releases and SEC filings. Defendant Clark can be served at 10503 Coving Cross Lane, Vienna, Virginia 22182.

12.     Defendant Glenn W. Reed ("Reed") was, during the Class Period, Executive Vice President, General Counsel and a director of UICI. Because of Reed's positions, he knew the adverse non-public information about the business of UICI, as well as its finances, markets and present and future business prospects via access to internal corporate documents (including UICI's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and via reports and other information provided to him in connection therewith. During the Class Period, Reed participated in the issuance of false and/or misleading statements, including the preparation and/or review of the false and/or misleading press releases and SEC filings. During the Class Period, while in possession of adverse non-public information, Reed sold 10,000 UICI shares for proceeds of $180,000. Defendant Reed can be served at 3901 Accent Drive, #824, Dallas, Texas 75287.

13.     Defendant David W. Keeler ("Keeler") was, during the Class Period, President of UICI's Cornerstone America division. Because of Keeler's position, he knew the adverse non-public information about the business of UICI, as well as its finances, markets and present and future business prospects via access to internal corporate documents (including UICI's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and

- 4 -

via reports and other information provided to him in connection therewith. During the Class Period, while in possession of adverse non-public information, Keeler sold 29,000 UICI shares for proceeds of $430,518. Defendant Keeler can be served at 4208 Fairway Drive, Flower Mound, Texas 75028.

14. Defendant Mark D. Hauptman ("Hauptman") was, during the Class Period, Vice President and Chief Financial Officer of UICI.. Because of Hauptman's position, he knew the adverse non-public information about the business of UICI, as well as its finances, markets and present and future business prospects via access to internal corporate documents (including UICI's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Class Period, while in possession of adverse non-public information, Hauptman sold 6,800 UICI shares for proceeds of $104,532. Defendant Hauptman may be served at 4109 Grace Lane, Grapevine, Texas 76051.

15. Defendant Matthew R. Cassell ("Cassell") was, during the Class Period, Vice President and Chief Financial Officer of UICI until his resignation on June 1, 2002. Because of Cassell's position, he knew the adverse non-public information about the business of UICI, as well as its finances, markets and present and future business prospects via access to internal corporate documents (including UICI's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Class Period, Cassell participated in the issuance of false and/or misleading statements, including the preparation and/or review of the false and/or misleading press releases and SEC filings. During the Class Period, while in possession of adverse non-public

- 5 -

information, Cassell sold 4,579 UICI shares for proceeds of $81,699. Defendant Cassell can be served at 12223 Snow White Drive, Dallas, Texas 75244.

16.    By reason of their positions, the officer and/or director defendants identified above, (collectively the "Individual Defendants") had access to material inside information about UICI and were able to control directly or indirectly the acts of UICI and the contents of the representations disseminated during the Class Period by or in the name of UICI.

17.    The defendants are liable, jointly and severally, as direct participants in the wrongs complained of herein.  Defendants had a duty promptly to disseminate accurate and truthful information with respect to UICI's products, operations, financial condition and future business prospects or to cause and direct that such information be disseminated so that the market price of UICI's shares would be based on truthful and accurate information.

18.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company were able to and did control the contents of the various quarterly and annual financial reports, SEC filings, press releases, and presentations to securities analysts pertaining to UICI. Each Individual Defendant was provided with copies of UICI's press releases and SEC filings alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their board membership and/or executive and managerial positions with UICI, each Individual Defendant had access to the adverse non-public information about UICI's business, finances, products, markets and present and future business prospects particularized herein, via access to internal corporate documents, conversations or connections with corporate officers and employees, attendance at UICI's management and/or Board of Directors' meetings and committees thereof and via reports and other information provided to them in connection therewith.  The Individual Defendants are liable for the false statements pleaded herein at ¶¶23-24, 26-28, 30-32, 34, 37, 42 and

44, as those statements were each "group published" information, the result of the collective action of the Individual Defendants.

19.     During the Class Period, the Individual Defendants engaged in the scheme to conceal UICI's badly flagging AMS division in order to prevent the decline in the price of UICI stock to: (i) protect and enhance their executive positions and substantial compensation; (ii) sell their personal shares at artificially inflated prices; and (iii) enhance the value of their personal UICI securities holdings and options.

20.     The defendants wanted to provide complete solutions for on-line enrollment, administration and claims processing for the healthcare industry. Defendants believed that the ability to offer complete solutions would cause UICI to be successful in future years and/or be an attractive acquisition target.

21.     Each of the defendants either knew or recklessly disregarded the fact that the illegal acts and practices and misleading statements and omissions described herein would adversely affect the integrity of the market for UICI stock and would artificially inflate or maintain the price of those shares. Each of the defendants, by acting as herein described, did so knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and members of the Class plaintiff seeks to represent.

## BACKGROUND TO THE CLASS PERIOD

22.     On June 3, 1999, Education Finance Group ("EFG") agreed to acquire 100% of the outstanding stock of AMS Investment Group, Inc., a holding company whose principal operations include those of AMS, for $58.2 million. AMS is the largest provider of tuition installment plans and also originates approximately $175 million of student loans per year. EFG completed the acquisition of AMS on July 26, 1999.

## FALSE AND MISLEADING STATEMENTS

23.     On January 17, 2000, the Company issued a press release entitled "UICI Announces

Management Reorganization at Its Education Finance Group, Inc. Unit." The press release stated in

part:

> UICI (the "Company") today announced that Education Finance Group, Inc.
> ("EFG"), a subsidiary of UICI, has completed a significant reorganization of its
> senior management group. At an EFG Board of Directors meeting held on January
> 14, Gregory T. Mutz (President and Chief Executive Officer of UICI) was elected
> Chairman, William A. (Skip) Hastings was elected to serve as President and Chief
> Executive Officer of EFG, and Lloyd C. Alcorn was elected as Treasurer and
> Secretary of EFG.

> Skip Hastings will assume overall executive responsibility at EFG. Hastings
> was formerly the President and Chief Executive Officer of Academic Management
> Services, Inc. ("AMS"), which EFG acquired in July 1999. Hastings has over eight
> years of experience in the educational finance arena after a twenty-two year career in
> banking. As chief executive officer of AMS, Skip Hastings helped build that
> company into the country's preeminent provider of tuition installment plans and
> student loans. Lloyd C. Alcorn, Executive Vice President and EFG's Chief Financial
> Officer, will retain responsibility for EFG's significant student loan funding
> activities.

24.     On May 15, 2000, the Company issued a press release entitled "UICI Announces

First Quarter 2000 Results of Operations." The press release stated in part:

> During the first quarter of 2000, EFG's student loan servicing operations
> incurred a loss of approximately $670,000. EFG continues to explore means to
> reduce operating costs and increase operating efficiencies at this operation. During
> the first quarter, EFG's Academic Management Services, Inc. subsidiary reported net
> income in the amount of $175,000, including gain on sale of student loans of $1.3
> million. Due to the seasonal nature of AMS' tuition installment plan activities, a
> significant portion of AMS' revenues and profits have historically been generated
> during the second quarter of the fiscal year.

> During the first quarter of 2000, EFG incurred additional expenses in
> connection with the sale of student loans in December 1999. The $280 million
> proceeds of this sale, which were received in late December 1999, were invested by
> EFG at short term rates until January 15, 2000, at which time the borrowings
> associated with the sold student loan assets could, in accordance with their terms, be
> paid down. These borrowings bore interest at rates in excess of short-term
> investment rates of approximately 2.5%

25. On July 27, 2000, defendant Jensen sold 175,000 UICI shares at $6.81 per share for proceeds of $1.19 million.

26. On February 21, 2001, the Company issued a press release entitled "UICI Announces Fourth Quarter and Full Year 2000 Results of Operations." The press release stated in part:

UICI's reported 2000 results from continuing operations include a pre-tax operating loss at the Company's Academic Management Services Corp. ("AMS") student loan unit of $(24.6) million, the Company's equity in losses of HealthAxis, Inc. of $(15.6) million, and a one-time $26.3 million pre-tax gain from the sale of investment securities.

Academic Management Services' disappointing 2000 operating results reflected, in part, a reduction in operating income as a result of reduced yields on AMS's student loan portfolio, which resulted from the acquisition of higher cost student loans in 1998 and 1999. AMS also incurred significant non-recurring expenses associated, among other things, with the management transition effected in January 2000, the relocation of AMS's headquarters, the write-off of facilities development costs and previously capitalized costs incurred in connection with AMS's Internet strategy, and previously announced closure of the San Diego loan origination center. AMS has engaged Lehman Brothers Inc. and Bank of America Securities Inc. to assist AMS in evaluating various strategic alternatives, including a possible sale of AMS.

27. On May 2, 2001, the Company issued a press release entitled "UICI Announces First Quarter 2001 Results of Operations." The press release stated in part:

Academic Management Solutions ("AMS"). For the three months ended March 31, 2001, AMS reported operating income of $269,000 compared to an operating loss of $8.5 million in the three months ended March 31, 2000. The significant improvement in operating results resulted primarily from reductions in operating expenses and a favorable interest rate environment during the three months ended March 31, 2001.

Total operating expenses of $11.6 million for the first quarter of 2001 were approximately $4.9 million less than in the comparable quarter of the prior year. As previously announced, in the first quarter of 2000 AMS incurred additional charges of approximately $3.5 million in connection with a management change effected in January 2000 and related changes in business infrastructure and strategy. In addition, AMS realized expense reductions in the first quarter of 2001 resulting from the closure of its San Diego facility, which was completed in the fourth quarter of 2000.

Declining market interest rates in the first quarter of 2001 resulted in improved spreads on AMS' student loan portfolio. Spread income was $3.4 million for the three months ended March 31, 2001 compared to $1.9 million for the

- 9 -

comparable period of the prior year, despite a reduction in portfolio size of approximately $180 million.

28. On August 1, 2001, the Company issued a press release entitled "UICI Announces Second Quarter 2001 Results of Operations." The press release stated in part:

> Academic Management Services ("AMS"). AMS reported operating income of $5.2 million and an operating loss of $(791,000) for the three months ended June 30, 2001 and 2000, respectively, and operating income of $5.5 million and an operating loss of $(9.3) million for the six months ended June 30, 2001 and 2000, respectively. AMS' revenues for the three and six months ended June 30, 2001 were $40.3 million and $77.7 million, respectively, compared to revenues of $44.8 million and $81.0 million for the comparable periods in the prior year. For the reasons set forth below, the Company does not believe that AMS' favorable results for the three and six-month periods ended June 30, 2001 are predictive of results to be expected during the third and fourth quarters of 2001 and the full fiscal year.

> The significant improvement in operations for the three and six months ended June 30, 2001 compared to the three and six months ended June 30, 2000 resulted primarily from a favorable interest rate environment and increased gains on sales of loans. Declining market interest rates through the first six months of 2001 resulted in improved spreads on AMS' student loan portfolio, despite a modest reduction in portfolio size in the second quarter of 2001 compared to the second quarter of 2000.

29. On August 15, 2001, defendant Hauptman sold 3,000 UICI shares at $15.16 per share for proceeds of $45,480.

30. On October 31, 2001, the Company issued a press release entitled "UICI Announces Third Quarter 2001 Results of Operations." The press release stated in part:

> Due to rapidly declining market interest rates, shortly before September 30, 2001 the rate that AMS will earn on its portfolio again fell to the statutorily prescribed minimum rate, and, as a result, AMS currently expects spread income in the fourth quarter of 2001 to exceed spread income by $3.2 million earned in the third quarter. Fee income on tuition payment programs at AMS will be negatively impacted in the fourth quarter of 2001 by the seasonality of this business, which historically has generated its highest levels of fee income (and operating profits) in the second and third quarters of the calendar year and an operating loss in the fourth quarter of the calendar year. Fee income from tuition payment programs was $5.3 million and $12.6 million for the three and nine months ended September 30, 2001, respectively. Due to the inherent uncertainty surrounding spread income and the seasonality of its tuition installment bonuses, in any given quarter AMS may continue to rely on gains from timely sales of student loans to remain profitable for the quarter.

- 10 -

31.     On February 6, 2002, the Company issued a press release entitled "UICI Announces

2001 Full Year and Fourth Quarter Results of Operations." The press release stated in part:

> For the year ended December 31, 2001, UICI's Academic Management Services Corp. subsidiary ("AMS") reported operating income of $5.4 million compared to an operating loss of $(24.6) million for the comparable period in 2000. AMS reported operating income of $756,000 for the three months ended December 31, 2001 compared to an operating loss of $(12.4) million for the comparable period in 2000. The significant improvement in operating results for the year and three months ended December 31, 2001 resulted primarily from increased student spread income (*i.e.*, the difference between interest earned on outstanding student loans and interest expense associated with indebtedness incurred to fund such loans) attributable to a favorable interest rate environment, increased gains on sales of loans and continued efforts to reduce operating expenses.

> Due to rapidly declining market interest rates, shortly before September 30, 2001 the rate that AMS earned on its student loan portfolio again fell to the statutorily prescribed minimum rate, and, as a result, AMS' spread income in the fourth quarter of 2001 in the amount of $7.5 million exceeded spread income of $3.2 million earned in the third quarter of 2001 and spread income of $696,000 earned in the fourth quarter of 2000. Spread income for the year 2001 was $20.4 million compared to $6.7 million for the prior year. Fee income on tuition payment programs at AMS was negatively impacted in the fourth quarter of 2001 by the seasonality of this business ....

32.     On February 7, 2002, the Company issued a press release entitled "UICI Completes

$30 Million Bank Credit Facility." The press release stated in part:

> UICI (the "Company") today reported that it has completed two separate financings, the proceeds of which will be used for general corporate purposes and to fund the student loan origination activities of UICI's Academic Management Services Corp. ("AMS") subsidiary.

> On January 25, 2002, UICI entered into a three-year bank credit facility with Bank of America, NA and LaSalle Bank National Association. Under the facility, the Company may borrow from time to time up to $30.0 million on a revolving, unsecured basis. The Company intends to utilize the proceeds of the facility for general working capital purposes. As of the date hereof, the Company had no borrowings outstanding under the facility.

> The Company also reported that on January 30, 2002 AMS completed the sale of $335.0 million in auction rate notes (the "Notes") backed by federally- and privately-insured student loans held in the AMS portfolio. The Notes received credit ratings of "AAA" from Moody's Investor Services and Fitch Inc., representing the highest investment grade rankings assigned by these organizations. Banc of America Securities, LLC acted as placement agent for the Notes. The proceeds from the sale of the Notes will be used to fund new student loans.

*"These transactions illustrate the continued confidence of the credit and capital markets in both UICI and AMS, even in this tougher economic period," said Gregory T. Mutz, President and CEO of UICI.*

*According to Lloyd C. Alcorn, Chief Financial Officer of AMS, "the auction-rate note transaction expands AMS's ability to originate affordable student loans and adds to our funding base at a very competitive cost. In recent years, AMS has become a regular participant in the capital markets in support of our loan programs, and we plan to continue to access the capital markets in support of our growth."*

33.    From February 20 to 21, 2002, defendant Keeler sold 25,000 UICI shares at $14.51-

$14.83 per share for proceeds of $369,118.

34.    On May 1, 2002, the Company issued a press release entitled "UICI Announces First

Quarter 2002 Results of Operations." The press release stated in part:

> For the three months ended March 31, 2002, UICI's Academic Management Services Corp. subsidiary ("AMS") reported operating income of $4.2 million compared to operating income of $269,000 for the comparable period in 2001. The significant improvement in operating results for the three months ended March 31, 2002 resulted primarily from increased student loan spread income (*i.e.*, the difference between interest earned on outstanding student loans and interest expense associated with indebtedness incurred to fund such loans) attributable to a favorable interest rate environment and a reduction in interest expense on corporate borrowings. These increases were offset by lower realized gains on sale of loans and reduced yields on the trust balances associated with AMS' tuition installment plan business, in each case as compared to gains realized in the corresponding 2001 period.
>
> During the three month period ended March 31, 2002, AMS continued to benefit significantly from a favorable prescribed minimum rate earned on its student loan portfolio. On July 1, 2002, the floor rates on loans made under the federal FFELP student program for the period July 1, 2002 through June 30, 2003 will again be reset. Based on current prevailing market interest rates, the Company currently expects a decrease in the prescribed floor rates on its student loan portfolio, and, as a result, AMS believes that the spread income in the second half of 2002 will be significantly less than the level of spread income experienced in the second half of 2001 and the level of spread income currently expected in the first six months of 2002. In addition, results at AMS in the fourth quarter of 2002 will be negatively impacted by the seasonality of its tuition installment business, which historically has generated its highest levels of fee income (and operating profits) in the second and third quarters of the calendar year and an operating loss in the fourth quarter of the calendar year.

35.     From May 29 to 31, 2002, defendant Cassell sold 4,579 UICI shares at $17.76-$17.87 per share for proceeds of $81,699.

36.     On May 31, 2002, defendant Reed sold 10,000 UICI shares at $18.00 per share for proceeds of $180,000.

37.     On July 31, 2002, the Company issued a press release entitled "UICI Announces Second Quarter and First Six Months Results of Operations." The press release stated in part:

> In accordance with Statement No. 142, the Company testified for goodwill impairment as of January 1, 2002. As a result of the transitional impairment testing, during the quarter ended June 30, 2002, the Company determined that goodwill recorded in connection with the acquisitions of AMS and Barron Risk Management Services ("Barron") was impaired by a combined $6.9 million ($5.1 million net of tax). The Company has reflected this impairment charge in its financial statements as a cumulative effect of a change in accounting principal as of January 1, 2002 in accordance with Statement No. 142.

38.     On December 4, 2002, *Bloomberg* issued a press release entitled "UICI's Mutz on Forecast for Premiums, Revenue." The press release stated in part:

> Gregory Mutz, chief executive of UICI, talks with Bloomberg's Dylan Ratigan via satellite about his expectations for about 20 percent revenue growth in 2003 and a 14 percent increase in insurance premiums this year. The Dallas-based company sells health insurance to self-employed workers.
>
> (This is not a legal transcript. Bloomberg cannot guarantee its accuracy.)
>
> RATIGAN:     This morning we continue our special series, "High Growth." All this week, we have been looking at companies managing to post strong sales numbers quarter after quarter. On our radar today, Dallas-based life and health insurance company UICI. Sales grew significantly in the first three quarters of 2002. In the past 12 months, shares are up about 1 percent. And Chief Executive Greg Mutz with us this morning to talk about the company from Dallas, Texas.
>
> And Greg, we welcome you to the program. Good morning.
>
> MUTZ:     Good morning, Dylan.
>
> RATIGAN:     Let's talk about a recent criticism in The Wall Street Journal about a misrepresentation of your business, by way of association. In other words, the criticism is that you present yourself as a non-profit association to counsel those in need of insurance. They come through the non-profit. Ultimately, you sell them insurance and then are able to raise premiums and avoid fees from insurance regulators. How do you digest and respond to the body of that criticism?

- 13 -

MUTZ:       Well, I was disappointed by the article, Dylan.  I think it greatly misrepresents our business.  We provide an affordable and an accessible health insurance product to a very important market niche, the self-employed, and the micro-business people.  The associations have been around for a long time.  They're well known.  They're not – they're for-profit.  We have – there's no hidden links and no – there's nothing about our business model that disturbs me.  I think you see a lot of press about health insurance.  Generally, prices and premiums are going up.  There's a lot of complexity in the marketplace.  And I think this is just one more story in the news about what's going on in health insurance.

*       *       *

MUTZ:       Well, I'm fairly optimistic about next year.  I feel pretty good about the marketplace.  As long as we can put together an affordable health insurance product that provides accessibility and choice to the customer, and – I think we will do just fine.  I think you will see revenue growth next year in the strong double-digit area.

RATIGAN:       Meaning more than 90?  I mean, when you say strong double digit, you mean.

MUTZ:       Well, I mean.

RATIGAN:       ... well above 10 percent?

MUTZ:       Yes.  I think we'll be in – I think we'll be north of a 20-percent revenue growth next year.

39.       On January 3, 2003, defendant Mutz sold 9,600 UICI shares at $15.60 per share for proceeds of $149,760.

40.       On January 6, 2003, defendant Hauptman sold 3,800 UICI shares at $15.54 per share for proceeds of $59,052.

41.       On January 13, 2003, defendant Keeler sold 4,000 UICI shares at $15.35 per share for proceeds of $61,400.

42.       On April 30, 2003, the Company issued a press release entitled "UICI Announces First Quarter 2003 Results of Operations."  The press release stated in part:

UICI (the "Company") today reported first quarter 2003 revenues and income from continuing operations of $434.0 million and $20.0 million ($0.42 per diluted share), respectively, compared to revenues and income from continuing operations of $312.3 million and $12.1 million ($0.25 per diluted share), respectively in 2002.  Overall, for the quarter ended March 31, 2003, the Company reported net income in the

- 14 -

amount of $21.1 million ($0.44 per diluted share), compared to net income of $7.0 million ($0.14 per diluted share) in 2002.

*    *    *

Academic Management Services Corp.

For the three months ended March 31, 2003, UICI's AMS unit reported operating income of $1.5 million compared to operating income of $4.1 million in the year earlier period. The decrease in operating results for the three months ended March 31, 2003 resulted primarily from decreased student loan spread income (*i.e.*, the difference between interest earned on outstanding student loans and interest expense associated with indebtedness incurred to fund such loans).

During the first quarter of 2002, AMS benefitted significantly from a favorable prescribed minimum rate earned on its student loan portfolio. On July 1, 2002, the floor rates on loans made under the federal FFELP student loan program for the period July 1, 2002 through June 30, 2003 reset 193 basis points lower than the floor rates in effect for the period July 1, 2001 through June 30, 2002. Reflecting this downward adjustment on July 1, 2002 to the floor rate on loans made under the federal FFELP student loan program, AMS' student loan spread income declined significantly from $7.9 million in three months ended March 31, 2002 to $5.6 million in the three months ended March 31, 2003.

AMS' tuition payment programs generated fee income in the quarter ended March 31, 2003 in the amount of $2.9 million, compared to fee income in the year earlier quarter of $2.7 million. This modest increase in fee income was offset by a 21.2% decrease in investment income on trust funds held in connection with tuition payment programs ($814,000 in the first quarter of 2003 compared to $1.0 million in the first quarter of 2002) as a result of lower prevailing market interest rates (despite a 25.6% increase in the average trust fund balance.)

As a result of the variability of student loan spread income, AMS may continue to rely on gains from timely sales of student loans to remain profitable during certain periods. AMS generated gains on sales of student loans in the amount of $1.2 million in the three months ended March 31, 2003, compared to gains of $1.1 million in the comparable 2002 period. In the three months ended March 31, 2003, AMS sold $68.1 million principal amount of student loans compared to sales of $58.1 million principal amount of student loans in the comparable 2002 period.

43.    From May 6 to 8, 2003, defendant Mutz sold 472,611 shares at $13.18-$13.67 per share for proceeds of $6.3 million.

44.    On May 8, 2003, the Company issued a press release entitled "UICI Announces Purchase of UICI Shares from Gregory T. Mutz." The press release stated in part:

- 15 -

UICI (the "Company") today announced that on May 6 it completed the purchase of 207,104 shares of UICI common stock from Gregory T. Mutz, President and Chief Executive Officer of the Company. The shares were purchased at a price of $13.67 per share, which was the closing price of UICI shares on the New York Stock Exchange on May 5, 2003. A substantial portion of the proceeds from the sale was used to retire indebtedness owing by Mr. Mutz to the Company in the amount of $1.3 million, which indebtedness had initially been incurred by Mr. Mutz in 1998-99 to acquire shares of UICI stock.

In a separate transaction, on May 8, Mr. Mutz sold 265,507 shares of UICI common stock to Ronald L. Jensen (Chairman of the Company). All of the proceeds of such sale were used by Mr. Mutz to pay in full indebtedness owing to Mr. Jensen, which indebtedness had initially been incurred to acquire shares of UICI stock in 1998.

45.     On July 21, 2003, the Company issued a press release entitled "UICI Announces Collateral Issues at Subsidiary's Student Loan Financing Facilities." The press release stated in part:

UICI (the "Company") today announced the discovery of a shortfall in the type and amount of collateral supporting two of the securitized student loan financing facilities entered into by three special financing subsidiaries of Academic Management Services Corp. ("AMS"), UICI's wholly-owned subsidiary. The three special financing subsidiaries involved are EFG-III, LP, EFG Funding LLC and AMS-1 2002, LP. In addition, all seven special financing subsidiaries of AMS and AMS may have failed to comply with their respective reporting obligations under the financing documents.

AMS (based in Swansea, MA) is engaged in the student loan origination and funding business, student loan servicing business, and tuition installment payment plan business. AMS finances its student loan origination activities through the seven special financing subsidiaries, each of which issues debt securities, including commercial paper (through EFG Funding LLC), auction rate notes (through EFG-II, LP, EFG-IV, LP, AMS-1 2002, LP, and AMS-3 2003, LP), and floating rate notes (through EFG-IV, LP and AMS-2 2002, LP). The commercial paper issued by EFG Funding LLC is supported by a liquidity facility provided by Bank of America and Fleet Bank and the underlying variable funding note issued by EFG-III, LP has the benefit of a financial guaranty insurance policy issued by a monoline insurer rated AAA/Aaa. The notes issued by each of EFG-II, LP, EFG-IV, LP and AMS-1 2002, LP also have the benefit of a financial guaranty insurance policy issued by a monoline insurer rated AAA/Aaa.

The problems at EFG-III, LP and EFG Funding LLC are of three types: insufficient collateral, a higher percentage of alternative loans (i.e., loans that are privately guaranteed as opposed to loans that are guaranteed by the federal government) included in the existing collateral than permitted by the loan eligibility provisions of the financing documents and deficiencies with respect to reporting requirements. Specifically, it is believed that certain reports concerning the collateral were misstated, that as of June 30, 2003, the variable funding note underlying the

commercial paper issued by EFG Funding LLC (approximately $440 million outstanding) was under collateralized and $59 million (exclusive of accrued interest) of the existing collateral was not in compliance with the loan eligibility requirements. The under collateralization will be partially addressed by the transfer by AMS to EFG- III, LP of approximately $190 million of federally-guaranteed student loan and other qualified assets that meet loan eligibility requirements under the financing documents (which transfer will reduce the under collateralization from $263 million to $73 million) and the possible transfer by AMS to EFG-III, LP of $34.4 million of uninsured student loans that do not meet loan eligibility requirements under the financing documents. These transfers will not fully resolve the shortfalls in type and amount of collateral.

The problems at AMS-1 2002, LP consist primarily of approximately $17 million of alternative student loans (exclusive of accrued interest) in excess of the loan eligibility requirements for such loans in the financing documents as of June 30, 2003, and a deficiency in various reporting requirements.

UICI has no obligations with respect to the indebtedness of the special financing subsidiaries or with respect to the obligations of AMS relating to such financings. UICI believes, based on its ongoing investigation, that the previously published consolidated financial statements of AMS, as incorporated in UICI's consolidated financial statements, are accurate and fairly presented. However, UICI will assess the impact of the events at AMS on the carrying value of UICI's investment in AMS, which, at March 31, 2003, was approximately $65.0 million. Any impairment in UICI's carrying value may be reflected as a charge to UICI's earnings in the second quarter of 2003.

UICI is committed to working with all of the financial institutions involved to develop a plan to assess and resolve all of the issues associated with AMS' securitized student loan financings. There can be no assurance, however, that such a plan can be effectuated and that the required waivers and agreements by all of the interested parties can in fact be obtained. UICI is prepared to invest additional capital into AMS under appropriate circumstances as part of the effort to avoid losses to any party and to protect UICI's investment in AMS.

The former president of AMS has been put on leave and relieved of all responsibilities pending the completion of the ongoing investigation. Gregory T. Mutz, Vice Chairman of UICI, has been authorized by the Board of Directors of UICI to personally manage for the indefinite future the situation and to address the issues and matters at AMS. A failure to resolve the collateral and reporting issues discussed above in a timely manner could have a material adverse effect on AMS.

## UNDISCLOSED ADVERSE INFORMATION

46.     UICI's actual financial results and the true status of its operations were concealed by defendants, which operated to artificially inflate or maintain the market price of UICI shares during

the Class Period. Each of the press releases and statements particularized herein was false and misleading and misrepresented and/or failed to disclose the following material adverse information:

(a) That UICI's financial results were the result of accounting trickery as detailed in ¶¶47-52;

(b) That defendants knowingly tolerated UICI's inadequate internal accounting controls and consequently lacked any reasonable basis for the financial results reported by them;

(c) That UICI's reported income was materially overstated by in excess of $65 million;

(d) That only through UICI's accounting fraud had UICI achieved the earnings reported by defendants;

(e) That the AMS division was not successful and its fundamentals and prospects were deteriorating;

(f) That UICI had failed to account for costs associated with liabilities resulting from its AMS program and its reserves were materially understated; and

(g) As a result of the foregoing, there was no reasonable basis in fact for defendants' statements that UICI actually earned millions during the Class Period, as the adverse facts set forth above were inconsistent with and seriously undermined those statements such that defendants had no reasonable basis to believe them and did not, in fact, believe them.

## UICI'S FALSE FINANCIAL
## REPORTING DURING THE CLASS PERIOD

47. In order to inflate the price of UICI stock, defendants caused the Company to falsely report its results during the Class Period by failing to "write down" its assets associated with its AMS division.

48. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular

time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

49.     The Individual Defendants caused UICI to falsify its reported financial results by failing to write down its assets associated with its AMS division.

50.     GAAP, as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 5, Accounting for Contingencies, requires that a loss be accrued whenever it is probable a loss has been incurred or an asset impaired. If these conditions exist, a loss should be recorded for uncollectible receivables or groups of receivables even though the particular receivables that are uncollectible may not be identifiable. *See* SFAS No. 5, ¶¶8, 22.

51.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events

and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

52. Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### UICI MANAGEMENT'S RESPONSIBILITY FOR
### AND KNOWING FAILURE TO IMPLEMENT AND MAINTAIN
### ADEQUATE INTERNAL ACCOUNTING CONTROLS

53. UICI had a responsibility to maintain sufficient accounting controls to accurately report its financial results. It is well settled that the representations made by a company in its financial statements and in other financial disclosures to the public are the representations of that company's management. Indeed, even when a company issues audited financial statements together with the report of that company's independent auditors, that report always expressly provides that "the financial statements are the responsibility of [the company's] management."

54. According to SEC rules, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a company must establish an internal control structure. Pursuant to §13(b)(2) of the Exchange Act, UICI was required to:

(A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(i)    transactions are executed in accordance with management's general or specific authorization;

(ii)    transactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ....

55. Moreover, according to Appendix D to Statement on Auditing Standards No. 55, "Consideration of the Internal Control Structure in a Financial Statement Audit" ("SAS 55"),

- 21 -

management should consider, among other things, such objectives as (i) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets," and (ii) making certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

56.     As described in SAS 55, the applicability and importance of specific control environment factors, accounting system methods and records, and control procedures that an entity should establish should be considered within the context of such criteria as an entity's size, its organization and ownership characteristics, the nature of its business, the diversity and complexity of its operations, the entity's method of processing data, and its applicable legal and regulatory requirements. In short, the larger the entity, the more the nature of the entity's business is complex, diverse and sophisticated, and the public ownership of the entity customarily requires a sophisticated internal control structure to ensure that transactions are accurately recorded and that, prior to the public disclosure of any financial information, such transactions are compared to the existing assets (*e.g.,* comparing inventory as recorded on a company's books to those amounts actually "on hand") to eliminate any discrepancies between the recorded and actual amounts.

57.     According to SAS 55.13:

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

58.     Contrary to the requirements of GAAP and SEC rules, UICI failed to implement and maintain an adequate internal accounting control system. Since the beginning of 1999, at the latest, UICI management knowingly tolerated the existence of inadequate internal controls and/or

- 22 -

recklessly disregarded their obligation to implement adequate controls to ensure that the value of its assets were recorded in compliance with GAAP.

59.    On July 21, 2003, UICI revealed that it would need to increase charges associated with losses attributable to the AMS division.

## CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this lawsuit pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and on behalf of a class of persons who purchased UICI stock during the Class Period (the "Class"). Excluded from the Class are defendants herein, members of the immediate families of each of the defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

61.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all Class members is impracticable. UICI had approximately 46 million shares of common stock outstanding. Members of the Class are scattered throughout the United States.

(b)    There are questions of law and fact which are common to members of the Class and which predominate over any questions affecting only individual members. The common questions include, *inter alia*, the following:

(i)    Whether the defendants' acts as alleged herein violated the federal securities laws;

(ii)    Whether defendants participated in and pursued the common course of conduct complained of herein;

- 23 -

(iii)     Whether documents, SEC filings, press releases and other statements disseminated to the investing public and UICI's common stockholders during the Class Period misrepresented material facts about the operations, financial condition and earnings of UICI;

(iv)     Whether the market price of UICI stock during the Class Period was artificially inflated due to material misrepresentations and the failure to correct the material misrepresentations complained of herein; and

(v)     To what extent the members of the Class have sustained damages and the proper measure of damages.

(c)     Plaintiff's claim is typical of the claims of other members of the Class and plaintiff has no interests that are adverse or antagonistic to the interests of the Class.

(d)     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

(e)     Plaintiff anticipates that there will not be any difficulty in the management of this litigation as a class action.

62.     For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this action and the claims asserted herein. Because of the size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress individually for the wrongs complained of herein.

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

63.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

- 24 -

64.      This Count is brought by plaintiff pursuant to §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against UICI and the Individual Defendants.

65.      The defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of UICI shares in an effort to maintain artificially high market prices for UICI's shares in violation of §10(b) of the Exchange Act and Rule 10b-5. UICI and the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

66.      In addition to the duties of full disclosure imposed on the Individual Defendants by their status as controlling persons of UICI, as a result of their affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to UICI's shares, operations, financial condition and earnings so that the market price of UICI's shares would be based on truthful, complete and accurate information.

67.      UICI and the Individual Defendants, individually and in concert, directly and indirectly, by using the means and instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of UICI as specified herein. The defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in

an effort to assure investors of UICI's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about UICI and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of UICI stock during the Class Period.

68.     The primary liability, and controlling person liability of the defendants named in this Count arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at UICI during the Class Period and/or was a member of UICI's and/or its subsidiaries' management team; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of UICI, was aware of the true financial condition of UICI; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of UICI's management team, internal reports and other data and information about UICI's finances, operations, policies and practices at all relevant times; and (iv) each of the defendants was aware of UICI's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

69.     The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein. Such defendants' material misrepresentations or omissions were done knowingly and for the purpose and effect of concealing UICI's operating condition and future business prospects from the investing public and supporting the artificially inflated price of their stock, as demonstrated by said defendants' overstatements and misstatements of UICI's business, operations and future earnings prospects throughout the Class Period.

Defendants knew that UICI's financial statements were materially misstated throughout the Class Period.

70.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts by all defendants, as set forth above, the market price of UICI stock was artificially inflated during the Class Period. In ignorance of the fact that market price of UICI stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the shares trade, and the truth of any representations made to appropriate agencies as to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired UICI stock during the Class Period at artificially high prices and were damaged thereby.

71.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of UICI, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased UICI stock during the Class Period, or, if they had purchased such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

72.     By virtue of the foregoing, UICI and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.     As a direct and proximate result of the wrongful conduct of the defendants named in this Count, plaintiff and the other members of the Class suffered damages in connection with their purchases of UICI stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

74.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

75.     The Individual Defendants acted as controlling persons of UICI within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, substantial stock holdings, participation in and/or awareness of UICI's operations and/or intimate knowledge of their internal financial condition, business practices and products, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of UICI, including the content and dissemination of the various statements which plaintiff contends are false and misleading. UICI controlled the Individual Defendants and all of its employees. Each of the Individual Defendants was provided with or had unlimited access to copies of UICI's internal reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

76.     In particular, each of the Individual Defendants had direct involvement in or intimate knowledge of the day-to-day operations of UICI and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

77.     As set forth above, the defendants violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the Exchange Act.

- 28 -

78. As a direct and proximate result of the wrongful conduct of defendants, plaintiff and other members of the Class suffered damages in connection with their purchase of UICI stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of herself and the Class, prays for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding plaintiff and other members of the Class damages together with interest thereon;

C. Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D. Awarding plaintiff and other members of the Class equitable/injunctive and such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 26, 2004

PROVOST & UMPHREY LAW FIRM, LLP
WILLIE C. BRISCOE
State Bar No. 24001788

WILLIE C. BRISCOE

3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: 214/744-3000
214/744-3015 (fax)

LERACH COUGHLIN STOIA
    & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

MURRAY FRANK & SAILER LLP
BRIAN P. MURRAY
ERIC J. BELFI
275 Madison Avenue, Suite 801
New York, NY  10016
Telephone:  212/682-1818
212/682-1892 (fax)

Attorneys for Plaintiff

Rabin, Murray & Frank LLP    Fax:          (212) 682-1892
275 Madison Avenue          Tel:          (212) 682-1818
New York, NY 10016          Tel:          (800) 497-8076

## CERTIFICATION

I, _Delores Mele_, do hereby certify that:

I have reviewed the complaint and have authorized its filing.

I did not purchase securities of UICI that are the subject of the complaint at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

During the Class Period, I engaged in the following transactions involving the securities of UICI:

| TRANSACTION | TRADE DATE | NO. OF SHARES | PRICE/SHARE |
|---|---|---|---|
| bought | 9/28/01 | 276.7143 | 13.63 |

I have <u>sought to serve or served</u> (neither sought to serve nor served)(circle the one that applies) as a representative party on behalf of a class in an action brought under the federal securities laws that were filed during the three-year period preceding the date of this certification. If you have <u>sought to serve or served</u> as a representative party, please enter the case name(s) here:

I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and my activities in the lawsuit, as ordered or approved by the Court.

Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on 4 / 28 2004.

Signature _Delores Mele_

Address: 12095 Crystal Wells Rd., Nevada City, CA - 95959
County: Nevada
Phone: