IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE UICI SECURITIES LITIGATION    § <br>
§ <br>
§ <br>
§    CIVIL ACTION NO. <br>
§    3:04-CV-1149-P <br>
§ <br>
§

**MEMORANDUM OPINION AND ORDER**

Now before the Court are Defendants UICI, Academic Management Services Corp., Mark A. Hauptman and Gregory T. Mutz's Motion to Dismiss Plaintiffs' First Amended Consolidated Complaint ("Motion"), filed July 11, 2005 and Defendant Lloyd Alcorn's Rule 12(b)(6) Motion to Dismiss ("Alcorn Motion"), filed July 11, 2005. After careful consideration of the Parties' briefing and the applicable law, the Court hereby DENIES both motions.[1]

Plaintiffs assert claims against all Defendants for relief under § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5. They also assert claims against UICI and Mutz pursuant to § 20(a) of the Securities Exchange Act of 1934. Defendants move to dismiss all of Plaintiffs claims pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) for failure to plead fraud with particularity and for failure to state a claim upon which relief can be granted.

---

[1] Also pending is Plaintiffs' unopposed motion to extend the page limits for its response brief. The Court hereby GRANTS said motion.

1

## I.

Defendant UICI is a diversified financial services company whose stock trades on the New York Stock Exchange. UICI is a holding company that operates through its various subsidiaries. Historically, UICI has been in the business of providing insurance, however, in the mid-1990s, it diversified into financial services, including the student finance industry. UICI's subsidiary, Defendant Academic Management Services Corp. ("AMS"), was in the business of issuing, marketing, funding, and servicing student loans. AMS financed its student loan activities through several special purpose entities (EFG-II, EFG-III, EFG Funding, EFG-IV, AMS-1 2002 LP, AMS-II 2002 LP, and AMS-III 2003 LP). These student loan financing facilities issued debt securities secured by student loans and other collateral.

Plaintiffs purchased UICI common stock between February 7, 2002 and July 21, 2003 (the "Class Period"). Plaintiffs allege that Defendants UICI, UICI's CEO Gregory T. Mutz ("Mutz"), UICI's CFO Mark A. Hauptman ("Hauptman"), UICI's AMS subsidiary, and AMS's CEO Lloyd Alcorn ("Alcorn") (collectively, "Defendants") reported materially misleading income at UICI and AMS.

Plaintiffs allege that Defendants told investors that AMS attributed its earnings to a favorable interest rate environment and to AMS's ability to obtain reduced borrowing costs to fund student loans through the capital markets. Yet what Defendants failed to disclose was that AMS and Alcorn were manipulating AMS's loan balances to improperly secure the cheap funding. Specifically, AMS was improperly using loans that should have been securing one financing facility to secure another facility. AMS was also securing its facilities with too many ineligible private loans.

Plaintiffs allege that AMS's misleading statements inflated UICI's stock price until a potential purchaser discovered that AMS was in violation of the loan covenants. These violations put AMS in default on more than $440 million of student loans that were secured through the capital markets. The revelation of these problems forced UICI to reveal that it would take a $65 million charge to earnings, thereby causing the New York Stock exchange to halt trading in UICI's stock, the price of which collapsed nearly 30% in a single day of trading - down 43% from its Class Period high.

## II.

Plaintiffs assert claims against all Defendants for relief under § 10(b) and Rule 10b-5. They also assert claims against UICI and Mutz pursuant to § 20(a). Defendants move to dismiss all of Plaintiffs claims.

### A.

A court may not dismiss a plaintiff's complaint pursuant to Rule 12(b)(6) for failure to state a claim unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). To decide a motion to dismiss, the court must accept as true the allegations of the complaint and view them in the light most favorable to the plaintiffs. *See Coates v. Heartland Wireless Comm'ns, Inc.,* 26 F. Supp. 2d 910, 914 (N.D. Tex. 1998) (Fitzwater, J.).

To survive a Rule 12(b)(6) dismissal, the plaintiffs must allege facts entitling them to relief for their substantive causes of action. Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange]

3

Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors." 15 U.S.C. § 78j(b). Rule 10b-5, in relevant part, makes it unlawful for any person,

directly or indirectly, "[t]o make any untrue statement of a material fact or to omit to state a material

fact necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading . . . in connection with the purchase or sale of any security." 17

C.F.R. § 240.10b-5. To establish a securities fraud claim under Rule 10b-5, a plaintiff must show

(1) a misstatement or an omission, (2) of a material fact, (3) made with scienter, (4) on which the

plaintiff relied, and (5) which proximately caused the plaintiff's injury. *See Williams v. WMX*

*Techs., Inc.*, 112 F.3d 175, 177 (5th Cir.), cert. denied, 522 U.S. 966 (1997); *Tuchman v. DSC*

*Comm'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994).

Section 20(a) defines controlling person liability. It provides, in pertinent part, that "[e]very

person who, directly or indirectly, controls any person liable under any provision of this chapter

. . . shall also be liable jointly and severally with and to the same extent as such controlled person

. . . " 15 U.S.C. § 78t(a).

**B**.

Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting

fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Section 10(b) claims sound

in fraud. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). Therefore, a plaintiff's

pleadings must satisfy the heightened pleading requirement for fraud set forth in Rule 9(b). *See*

*Oppenheimer v. Prudential Secs. Inc.*, 94 F.3d 189, 195 (5th Cir.1996); *Tuchman*, 14 F.3d at 1067.

Section 10(b) and Rule 10b-5 require a plaintiff to allege a materially false or misleading statement

on the part of each defendant. *See* 15 U.S.C. § 78(j); 17 C.F.R. § 240.10b-5; *Southland Sec. Corp.*

*v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004). Such particularity is required so that the complaint provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. *See id.*

To satisfy the heightened pleading requirement of Rule 9(b), a plaintiff must "'plead with sufficient particularity attribution of the alleged misrepresentations or omissions to each defendant; the plaintiff is obligated to 'distinguish among those they sue and enlighten each defendant as to his or her part in the alleged fraud.'" *Coates*, 26 F. Supp. 2d at 915 (citations omitted). A plaintiff must (1) specify each statement alleged to have been misleading, *i.e.,* contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent. *See Goldstein v. MCI Worldcom,* 340 F.3d 238, 245 (5th Cir. 2003). A plaintiff "must plead specific facts, not mere conclusory allegations." *Tuchman*, 14 F.3d at 1067 (citation omitted). The court will not accept conclusory allegations and unwarranted deductions as true on a motion to dismiss. *Id.*

Finally, a plaintiff who asserts a § 10(b) claim must satisfy the requirement for pleading scienter set forth in the Private Securities Litigation Reform Act ("PSLRA"). The PSLRA mandates that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). A securities fraud plaintiff must plead facts demonstrating that the defendant either consciously misbehaved in making its statements, or

was so severely reckless that the defendant must have been aware of the danger of misleading the investing public.  *See Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 697 (5th Cir. 2005).

**III**.

Plaintiffs allege that Defendants reported materially misleading income at UICI and AMS and misleadingly reported that AMS's earnings were attributable to a favorable interest rate environment and to AMS's ability to obtain reduced borrowing costs to fund student loans through the capital markets.  (Compl. ¶ 67.)  Plaintiffs allege that Defendants unlawfully failed to disclose that AMS was able to access those interest rates and reduced borrowing costs by manipulating AMS's loan balances and violating the financing covenants.  (Compl. ¶ 67.)  Plaintiffs allege that Alcorn did this by fabricating loans, taking loans from some securitizations and labeling them as loans for other securitizations, falsely reclassifying non-federal loans as federal loans, and undercollateralizing the securitizations.  (*See e.g.,* Compl. ¶¶ 28, 77, 83.)

**A**.

Plaintiffs identify several allegedly fraudulent statements: First, Mutz's statement that "these transactions [sale of auction rate notes] illustrate the continued confidence of the credit and capital markets in both UICI and AMS, even in this tougher economic period."  (Compl. ¶ 61.)  Plaintiffs also identify Alcorn's statements that the "auction rate transaction expands AMS's ability to originate affordable student loans and adds to our funding base at a very competitive cost" and "[i]n recent years, AMS has become a regular participant in the capital markets in support of our loan programs."  (Compl. ¶ 61.)  Plaintiffs also allege that UICI, Mutz, and Hauptman misled investors and analysts by stating on numerous occasions that UICI's 2002 financial success was due to AMS's ability to benefit from a favorable interest rate environment and reduced borrowing costs.  (Compl.

¶¶ 64-65.)  UICI and Mutz made those statements in numerous press releases, a conference call, and in UICI's Form 10-Qs filed throughout 2002 and in the early part of 2003.  (Compl. ¶¶ 61-73-75.)

Defendants contend that Plaintiffs have not pled fraud with the requisite particularity because they have failed to explain the reasons why these statements were misleading.  Specifically, Defendants maintain that Plaintiffs fail to allege specific facts explaining how the undercollateralization problem caused the financial results of AMS and UICI to be misleading. (Mot. at 11.)  They contend that Plaintiffs' allegation that the undercollateralization artificially inflated AMS's performance is based on speculative inferences that had these issues been disclosed, AMS would have had to borrow at unfavorable rates and these unfavorable rates would have adversely impacted AMS's results.  (Mot. at 11-12.)

The thrust of Plaintiffs' complaint is that Alcorn's collateral manipulations enabled AMS to access the capital markets, thereby reducing AMS's cost of capital.  This artificial reduction in the cost of capital caused AMS's financial results, and consequently UICI's results, to be materially misleading.  Indeed, Mutz and Alcorn specifically attributed AMS's success to a reduction in interest expense on corporate borrowings.  (Compl. ¶¶ 24, 27, 61, 65.)  So did the UICI quarterly financial statements. (Compl. ¶¶ 29, 37, 64, 68, 71, 75, 78.)  Without a reduced interest expense, AMS's costs would have been higher and thus, its earnings lower.  It is not speculative to conclude that AMS could not have accessed the capital markets and obtained capital at a reduced cost if they had been found in violation of the terms of their indenture agreements.  According to Plaintiffs, Defendants repeatedly attributed AMS's success to "a reduction in interest expense on corporate borrowings."  (Compl. ¶ 3, 64, 68, 71, 75.)  It is reasonable to conclude that without it, AMS's financial results would have been materially different.  Moreover, Plaintiffs allege that these

7

revelations caused AMS to change its business model from originating and servicing loans to originating and selling loans, thereby decreasing AMS's value to 38% of its reported value. (Compl. ¶ 47.)  This fact further bolsters Plaintiffs' allegation that AMS's performance was artificially inflated.

Defendants argue that Plaintiffs contradict themselves in their Complaint by alleging on one hand that AMS reported misleading financial results that caused UICI's financial statements to be misleading, while on the other hand alleging that AMS's "Monthly Financial Statement Packages" were not manipulated or misleading. (Mot. at 12-13.)  However, this is a mischaracterization of Plaintiffs' Complaint. Plaintiffs' Complaint alleges that from early-2002 through July 2003, AMS's Monthly Financial Statement Packages contained accurate information that was sent to UICI executives, whereas AMS's "Investor Reports" were fraudulently manipulated and were also sent to UICI executives.  (Compl. ¶¶ 31-36.)  Plaintiffs allege that UICI executives were reckless in disregarding the discrepancies between the two reports. (Compl. ¶ 36.)  Plaintiffs do not allege that UICI used the AMS's Monthly Financial Statement Packages as the basis for UICI's financial statements.  In fact, the Court would suggest that all inferences are to the contrary - that UICI used some other manipulated AMS records as the basis for its financial statements.  Moreover, Plaintiffs cite these facts as evidence of scienter.   They do not demonstrate in any way the lack of a misrepresentation.

Defendants also state in a conclusory fashion  - without citing any authority - that because neither UICI nor its auditors found any reason to restate any of its previously-filed financial statements, they must not have been false or misleading.  (Mot. at 12.)  They also argue that Plaintiffs failed to plead that AMS's financial situation had any effect on UICI.  (Mot. at 12.)

However, Plaintiffs do plead that the revelation of AMS's improper conduct caused UICI to take a $65 million charge to its earnings and a collapse of its stock price by 30% in a single day. (Pls.' Compl. ¶ 46.)[2]

Defendants argue that Plaintiffs' recitation that each purported misrepresentation by Mutz, Hauptman, and UICI is misleading "for the reasons alleged at ¶¶ 30, 62" is devoid of the requisite particularity. The Court disagrees. The paragraphs at issue (Paragraphs 67, 70, 73, 77) contain statements made by various Defendants touting UICI's and AMS's successes. Plaintiffs specifically allege that these statements were materially misleading because the purported accomplishments were attributed to conditions procured by fraud (*i.e.* a favorable interest rate environment and a reduction in interest expense on corporate borrowings). Paragraphs 30 and 62 serve to illustrate how AMS secured those conditions (by falsely reporting that its facilities were sufficiently collateralized). Thus, these allegations state with sufficient particularity why the statements are misleading.

For these reasons, the Court concludes that Plaintiffs have satisfied the pleading requirements for Rule 9(b) and have pled fraud with particularity with respect to all Defendants.

## B.

Defendants also assert that Plaintiffs have alleged only one potentially actionable misrepresentation by AMS, which is a misrepresentation made by Alcorn in a February 7, 2002 UICI press release. Defendants further claim that the misrepresentation is non-actionable as a forward-looking statement that is protected by the PSLRA's safe-harbor provision.

---

[2] Defendants argue that the Complaint is deficient because it alleges a misrepresentation made by UICI, not by AMS. (Mot. at 41.) Although this is argued in the scienter section of Defendants' brief, it is a Rule 9(b) issue. Moreover, the Complaint does allege a misrepresentation by AMS via Alcorn – Alcorn said in a UICI press release that the sale of $335 million in auction rate notes would fuel AMS's growth because it expand[ed] AMS's ability to originate affordable student loans and add[ed] to [AMS's] funding base at a competitive cost. (Compl. ¶¶ 27, 61.)

The PSLRA's safe-harbor provision precludes liability for forward-looking statements that are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).   The statutory safe harbor provision does not protect misrepresentations made concerning historical/hard or current facts. *See In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 906 (S.D. Tex. 2001).  Likewise, the safe harbor provision does not protect statements that defendants knew were false or misleading. *See id.*  Moreover cautionary language regarding a prediction does not excuse a misrepresentation where the speaker knows of material adverse facts and fails to reveal them. *See id.* ("the safe harbor will not apply if the statement was made with 'actual knowledge' that the statement was false or misleading").

The entire statement made by Alcorn reads: "the auction rate note transaction expands AMS's ability to originate affordable student loans and adds to our funding base at a very competitive cost.  In recent years, AMS has become a regular participant in the capital markets in support of our loan programs, and we plan to continue to access the capital markets in support of our growth."  (Compl. ¶ 61.)

Defendants contend that Alcorn's statement that "we [AMS] *plan* to continue to access the capital markets in support of our growth" (emphasis added) was sufficiently cautionary to be considered "forward-looking."  (Mot. at 14.)  Likewise, Defendants maintain that the same UICI press release contained adequate cautionary language where it stated that the level of competition currently in existence in the secondary market for loans made under the Federal Loan Programs

could be reduced, resulting in fewer potential buyers of the loans and lower prices available in the secondary market for these loans.  (Defs.' App. at 367.)[3]

The statement that is misleading and forms the basis for this lawsuit is the present, then-existing factual statement that "the auction rate note transaction expands AMS's ability to originate affordable student loans and adds to our funding base at a very competitive cost."  That statement is false/misleading because the 'competitive cost' was secured through unlawful means - specifically, by violating covenants in the financing instrument.  Nothing in that statement is forward looking.  Moreover, the forward-looking portion of the statement - that AMS plans to continue to access the capital markets - is not protected by the safe-harbor provision because the safe-harbor provision does not apply to misrepresentations where the speaker knows of material adverse facts and fails to reveal them.  *See BMC Software*, 183 F. Supp. 2d at 906.  According to the Complaint, Alcorn knew that AMS could only continue to access the capital markets through the same alleged fraudulent collateral manipulation that enabled it to secure the financing in the first place.  Therefore, Alcorn's statement is not protected.

To be a meaningful cautionary statement, the statement must have identified the important factors that caused the actual results to differ materially from those in the forward-looking statement.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).  Yet the cautionary language upon which Defendants rely - that

---

[3] On several occasions, Defendants cite to evidence and facts outside the four corners of the Complaint to support their arguments.  Federal Rule 12(b) states that "[i]f, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . ."  However, outside evidence of cautionary statements submitted by defendants may be considered by the court without causing conversion to a summary judgment motion ("on any motion to dismiss based upon [the safe harbor provision], the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant").  15 U.S.C. § 78u-5(e).  To the extent extrinsic evidence has been submitted for purposes other than to establish a cautionary statement, the Court will not consider it.  This motion will be treated as a one for failure to state a claim.

the level of competition currently in existence in the secondary market for loans made under the Federal Loan Programs could be reduced, resulting in fewer potential buyers of the loans and lower prices available in the secondary market for these loans - bears no relation to the actual risk.  To be a meaningful cautionary statement, the statement must have identified the important factors that caused the actual results to differ materially from those in the forward-looking statement.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).  Thus, for a statement to have been sufficiently cautionary, it would have had to warn that AMS's financing could not be obtained without violating the covenants in the financing instruments themselves.  For these reasons, the safe harbor provision does not apply to Alcorn's statement.

## C.

Defendants next argue that Alcorn's February 7, 2002 press release statement is non-actionable "because it falls squarely within the Fifth Circuit's definition of puffery."  (Mot. at 15.) The Fifth Circuit has held that generalized, positive statements about a company's competitive strengths and future prospects are not actionable because they are not material.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003).

Defendants rely heavily on *In re Michaels Stores, Inc. Sec. Litig.*, Civ. A. No. 3:03-CV-0246M, 2004 WL 2851782, at *5-6 (N.D. Tex. Dec. 10, 2004) (Lynn, J.)  and attempt to analogize this case to that one.  In *Michaels*, the statement at issue was "we are very pleased with our continuing performance.  The investments we have made in our systems and infrastructure are really starting to pay off, and we're in great shape as we enter the fall and holiday seasons.  We remain very optimistic and we have considerable momentum as we head into the third quarter."  *Id.* at *5. That court held that all the statements, including the statement regarding investment in the

company's "systems and infrastructure" were non-actionable because the company did not refer to any particular improvements in the company's systems or infrastructure or how they impacted the company's bottom line. Because the statements did "not convey a present fact that an investor would likely find material in determining whether to purchase the company's stock," the claim was found to be non-actionable. *Id.* at *6.

In this case, Plaintiffs identify as fraudulent Mutz and Alcorn's statements that AMS's success was due to its ability to obtain low-cost financing via the credit and capital markets. (Compl. ¶¶ 24, 61.) Specifically, Plaintiffs cite Mutz's statement that "these transactions [sale of auction rate notes] illustrate the continued confidence of the credit and capital markets in both UICI and AMS, even in this tougher economic period." (Compl. ¶ 61.) Plaintiffs also identify as fraudulent Alcorn's statements that the "auction rate transaction expands AMS's ability to originate affordable student loans and adds to our funding base at a very competitive cost" and "[i]n recent years, AMS has become a regular participant in the capital markets in support of our loan programs." (Compl. ¶ 61.)

These statements are more than generalized positive statements about AMS's competitive strengths. Defendants state with specificity how and why their business is succeeding. They specifically explain that AMS had the ability to obtain low-cost financing that increased AMS's profitability. These statements provided critical information to investors about what AMS was accomplishing, the way AMS was operating, and why AMS was profitable. These statements were likely to be material to investors who were deciding whether to purchase UICI's stock. In fact, the allegations indicate that the statements were material because UICI's stock price collapsed 30% in a single day when it was revealed that AMS could not access the capital markets and obtain the low-

cost financing that had been driving its profitability.  (Compl. ¶¶ 5, 46, 83.)  Thus, these statements were not mere puffery.

## D.

Defendants also argue that Plaintiffs' Complaint fails to meet the pleading requirements of Rule 9(b) because the allegations that are derived from confidential witnesses are not pled with the requisite particularity.

The Fifth Circuit has held that where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.  *See ABC Arbitrage v. Tchuruk,* 291 F.3d 336, 352 (5th Cir. 2002).  Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.  *See id.*  In other words, Plaintiffs "need not name the personal sources as long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief."  *Id.* at 353.

Plaintiffs rely heavily on - and Defendants object vigorously to - information provided to Plaintiffs from CW9.  CW9 is described as a controller at AMSI prior to the acquisition, after the acquisition, and throughout the Class Period.  (Compl. ¶ 15.)  Through CW9, the Complaint avers scienter on the part of AMS (via Alcorn), Hauptman, Mutz, and UICI based on knowledge of or severely reckless disregard for discrepancies between AMS's Monthly Financial Statements

14

Packages and the allegedly manipulated Investor Reports. (Compl. ¶¶ 85, 89.) Defendants allege that these allegations by CW9 fail to meet the pleading requirements.

The Complaint specifically alleges based on CW9's knowledge that Alcorn instructed Bud Mercer (of the portfolio department) to change loan information contained in the electronic Servicer Reports before sending them to Paul Gennari, who was responsible for preparing and distributing AMS's Investor Reports to UICI. (Compl. ¶¶ 33, 35.) Plaintiffs also allege, based on CW9's knowledge, that Alcorn manipulated the Investor Reports with respect to EFG-III's loans to create the appearance that AMS was in compliance with the financing documents. (Compl. ¶¶ 34, 85.)

CW9 is described in the Complaint as a controller at AMSI and then at AMS. A controller is an officer of a business who is charged with duties relating to the fiscal affairs of the company, principally to examine and audit the accounts, to keep records, and to report on the financial situation from time to time. *See* Black's Law Dictionary (6th ed. 1990). With these job responsibilities, it is probable that CW9 would possess the information alleged. For this reason, the Court concludes that these allegations by CW9 have been sufficiently pled.

## IV.

Defendants challenge whether Plaintiffs have adequately alleged scienter as to each Defendant.

## A.

In a § 10(b) action, a plaintiff must allege facts demonstrating scienter. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Barrie v. Intervoice Brite*, 397 F.3d 249, 263 (5th Cir. 2005). The PSLRA mandates that Plaintiffs "state with particularity facts giving rise to a strong inference that the defendants acted with" scienter. 15 U.S.C. § 78u-4(b)(2). Thus, a

15

securities fraud plaintiff must plead facts demonstrating that the defendant either consciously misbehaved in making its statements, or was so severely reckless that the defendant must have been aware of the danger of misleading the investing public. *See Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 697 (5th Cir. 2005). This "rigorous pleading standard" requires the court to weigh the allegations to "determine whether the inferences toward scienter are strong or weak." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003).

It is well-established that bare allegations of motive and opportunity will not suffice to satisfy the pleading requirements of the PSLRA. *See id.* Nevertheless, "'appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter.'" *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 368 (5th Cir. 2004) (citation omitted). The court must look at the complaint in its entirety when deciding whether it adequately pleads scienter. *See Barrie*, 397 F.3d at 263.

Defendants argue that Plaintiffs rely on impermissible "group pleading" to satisfy their scienter requirement. (Mot. at 40.) The Court rejects this argument. Throughout the Complaint, Plaintiffs specifically set forth separate scienter allegations for each defendant.

The Court also rejects Defendants argument that Plaintiffs seek to impute scienter to Mutz, Hauptman, and UICI (the parent corporation) via AMS's and/or Alcorn's (the subsidiary) knowledge. (Mot. at 37-39.) In fact, quite the contrary is true; the Complaint identifies specific facts for each Defendant that Plaintiffs believe give rise to a strong inference of scienter for each. Further, Plaintiffs do not rely on "collective scienter" to allege that UICI, Mutz, or Hauptman made misrepresentations with knowledge. Plaintiffs attribute particular statements and knowledge to each individual defendant and the Court will analyze those statements accordingly.

16

**B.**

Plaintiffs allege that Alcorn knew at all times during the Class Period that AMS was in violation of loan eligibility requirements because he was personally responsible for collateralizing AMS-1 2002, which was originated in January 2002 with $263 million in loans that should have been collateralizing AMS's EFG-III facility.  (Compl. ¶ 85.)  In other words, Plaintiffs allege that Alcorn was the individual responsible for moving collateral in and out of the securitizations. (Compl. ¶ 85.)  On January 30, 2002, AMS sold $335 million of auction rate notes (AMS-1 2002). (Compl. ¶ 27.)  Plaintiffs allege that Alcorn used loans to collateralize AMS-1 2002 that should have been collateralizing EFG-III.  (Compl. ¶ 28.)  Alcorn's conduct was directly responsible for AMS violating its loan covenants because he improperly used loans from one securitization (EFG-III) to collateralize another (AMS-1 2002) (Compl. ¶ 28.)  This allegation alone is sufficient to give rise to a strong inference that Alcorn made his February 7, 2002 statement with knowledge of its falsity.

**C.**

Plaintiffs allege that Mutz, as the CEO of UICI, knew of EFG's and AMS's inadequate controls for years and failed to adequately attempt to resolve the companies' deficiencies and hence, recklessly disregarded the companies' ongoing problems.  They also allege that Mutz was responsible for the companies' financial reporting, yet was reckless in failing to ensure the accuracy of the reports.  (Compl. ¶ 91-95.)

According to the Complaint, UICI's other subsidiaries had histories of engaging in reckless accounting and business practices in the late-1990s, of which Mutz was aware.  (Compl. ¶ 46.) Plaintiffs also specifically allege that Mutz had knowledge of EFG's ongoing internal control problems, including the $9 million write-off and the undisclosed options obligation, as early as

1999-2000.  (Compl. ¶¶ 19, 91.)  Likewise, Ernst & Young reported in 2000 (to Mutz and others) that AMS had serious internal control problems, including the inability to maintain accurate records for purchasing and originating student loans and the lack of a formal review and approval process for the transactions entered into by AMS.  (Compl. ¶ 92.)  Mutz knew that these problems caused Bank of America to call in its $30 million loan that EFG had used to purchase AMSI.  (Compl. ¶ 20.)

Plaintiffs also theorize that Mutz and UICI recklessly disregarded the fact that AMS's financial reports were misleading because they wanted an acquisition to occur and AMS's viability as an acquisition candidate depended on AMS's financial results.  (Compl. ¶ 3.)  Plaintiffs aver that when the prospective purchaser of AMS inquired about the discrepancy between the commercial paper balance in the facilities and the loans held to secure those balances, both Alcorn and CW9 assured the purchaser that AMS was in compliance and provided the purchaser with documentation and explanations to support their assurances.  (Compl. ¶ 48.)

Plaintiffs also argue in their briefing that Mutz's stock sale supports a strong inference of scienter.  (Resp. at 43.)  "[A]llegations of insider trading are essentially a form of motive and opportunity allegations."  *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 368 (5th Cir. 2004).  Insider trading may be probative of scienter only when done "'in suspicious amounts or at suspicious times.'"  *Id.*  Plaintiffs allege that from May 6-8, 2003, Mutz sold 55% of his UICI stock for $6.3 million.  (Compl. ¶ 43.)  This can be considered a suspicious amount in light of the fact that prior to this sale, Mutz had sold only 1% of his holdings during the entire time he served as UICI's CEO (beginning in 1999).  (Compl. ¶¶ 43, 81.)  This sale also came just weeks before UICI terminated Mutz's position as CEO (May 22, 2003) and two months before UICI

announced the $65 million charge that caused its stock to drop 30% in a single day of trading (July 21, 2003). (Compl. ¶¶ 43, 81.) The timing of this sale could be considered suspicious as well.

Plaintiffs also allege that Mutz (UICI's CEO) and Hauptman (UICI's CFO) were reckless in disregarding or failing to discover the fraudulent manipulations contained in the Investor Reports. Defendants rely on *Abrams v. Baker Hughes, Inc.* for the proposition that an "unsupported, general claim about the existence of [non-specific] confidential corporate reports that reveal information contrary to reported accounts" is not sufficient to survive a motion to dismiss. 292 F.3d 424, 432 (5th Cir. 2002). *Abrams* held that plaintiffs must also present corroborating details about the contents of the reports, their authors, and their recipients. *See id.* Additionally, the Ninth Circuit has held that "[i]f a report is the alleged source of the defendants' actual or constructive knowledge, plaintiffs must provide at least some specific 'adequate corroborating details,' *e.g.*, the sources of plaintiffs' information about the report, how plaintiffs learned of it, who drafted it, which officers received it, and a description of its contents." *In re Silicon Graphics, Inc.*, 183 F.2d 970, 985 (9th Cir. 1999).

Plaintiffs allege that both the Monthly Financial Statements Packages and the Investor Reports were distributed to Mutz and Hauptman. (Compl. ¶ 36.) CW9, AMS's controller, discovered the discrepancy between the commercial paper balance in the facilities and the actual loans held to secure those balances when he/she compared the Investor Reports with the Monthly Financial Statements Package. (Compl. ¶ 48.) CW9 raised these concerns with Alcorn in February/March 2002. (Compl. ¶ 48.) According to CW9, a simple review of any of AMS's Monthly Financial Statements Packages would have alerted Mutz and Hauptman to serious discrepancies in AMS's securitization balance and its required collateral. (Compl. ¶ 36.) Further,

had Mutz and Hauptman made a simple comparison between these reports at any time from early 2002 through July 2003, they would have discovered the discrepancies between the two. (Compl. ¶ 36.) Plaintiffs' Complaint provides detailed information about the contents of these reports, the drafters of the reports, and which officers received the reports (Mutz and Hauptman) sufficient to impute knowledge of their contents to Mutz and Hauptman. (Compl. ¶¶ 32-36.)

Furthermore, according to the Complaint, Mutz became increasingly involved in the operations of AMS in mid-2002 and 2003 and increased his own presence at AMS, becoming personally involved in the minutiae of AMS's business and day-to-day operations and restructuring its senior management. (Compl. ¶ 48.) Certainly, with this kind of involvement, Mutz would have been reviewing AMS's internal financial reports that purportedly disclosed the company's financial problems and would have been alerted to the discrepancies that were discovered by CW9. (Compl. ¶ 36.)

For these reasons, the Court concludes that Plaintiffs have sufficiently pled scienter against Alcorn, Mutz, Hauptman, and UICI.

## D.

Defendants also argue that Plaintiffs' claims fail as a matter of law because Plaintiffs have not adequately pled transaction causation (or reliance) pursuant to the Fifth Circuit's requirements set forth in *Natheson v. Zonagen, Inc.*, 267 F.3d at 400, 414 (5th Cir. 2001). Defendants argue that Plaintiffs have not pled that the alleged misrepresentations positively affected UICI's stock price. Therefore, Defendants conclude, the presumption of reliance is not permitted. (Mot. at 47.)[4]

---

[4]    In support of their argument, Defendants rely on a stock history chart that was submitted by Defendants and falls outside the four corners of the Complaint. (Mot. at 48.) For the reason stated *supra*, the Court will not consider extrinsic evidence presented by Defendants.

The Fifth Circuit has held that Plaintiffs are entitled to a presumption of reliance when the complained-of misrepresentation actually affected the market price of the stock.  *See Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 662 (5th Cir. 2004).  This can be established by showing an "increase in price following the allegedly false positive statements *or* a corresponding decrease in price following the revelation of the misleading nature of these statements."  *Id.* (emphasis added).

In this case, Plaintiffs allege in their Complaint a 30% decline in UICI's stock price immediately following the revelation of the facts that AMS was in violation of its loan covenants and that UICI anticipated taking a $65 million impairment charge as a result of the violations. (Compl. ¶¶ 46, 83-84.)  This allegation is sufficient to satisfy the requirement for pleading fraud-on-the-market and reliance.

## V.

For the reasons stated herein, the Court hereby DENIES Defendants' motion to dismiss.

It is SO ORDERED, this 29th day of September 2006.


_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE